

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-09-00092-CR

_____


ANTHONY TRENT BARBOUR, Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the 6th Judicial District Court
Lamar County, Texas
Trial Court No. 21634


Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

MEMORANDUM OPINION

C.S., an eight-year-old child, nearly died as a result of ingesting an unknown quantity of morphine. A jury convicted Anthony Trent Barbour of two counts of injury to a child. The court sentenced Barbour to twenty years' imprisonment on the first count and to ten years' imprisonment on the second count with the sentences to run concurrently. Appealing only the first count in a single point of error, Barbour argues that the evidence was insufficient to establish he knowingly or intentionally caused serious bodily harm to C.S. by administering or exposing him to morphine or heroin. We affirm the trial court's judgment.

## I.      Factual and Procedural Background

Paramedic Robert Cody rushed to respond to the dispatch of an eight-year-old boy in distress. When he arrived at the home of Lisa Hurst, he found her son C.S. unresponsive and on the verge of death. His agonal respirations were slow and erratic, and he was blue, due to the lack of oxygen. After noting that Barbour, his caretaker for the day, was nowhere to be found, Cody intubated C.S. and raced to the Paris Regional Medical Center (PRMC) emergency room.

On arrival, emergency room nurse Karen Vrba noted C.S.'s core temperature was an extremely low 87.5 degrees and his blood pressure was "pretty low." She was shocked to find C.S.'s body covered with excessive fresh and older bruising. C.S. was bruised on both sides of the forehead, his eye, neck, right buttock, right hip, knee, lower back and down the thighs, shins, and legs. Additionally, there was bruising above the rectum, "right above the penis and

2

scrotum . . . linear bruising, along the right side of his scrotum . . . [and] bruising to the tip of his penis." After taking his vital signs and charting the bruises, Vrba ran blood tests, obtained a urine specimen via catheter, and sent the samples to the laboratory for testing. When questioned, Hurst admitted to whipping the boy with a belt a few days before because he had run away. Barbour did not show up at the hospital and could not be questioned. When probed to offer an explanation of his condition, Hurst suggested C.S. had fallen and hit his head earlier in the day. A CAT scan ruled out brain trauma.

C.S.'s pediatrician, Ed Clark, took over and found C.S. "had been beat . . . [i]t was beyond spanking." Clark reviewed the PRMC toxicology report and was amazed to find it was positive for "Fentanyl, which is a very potent opioid . . . [and][m]orphine, which is also an opiate," although none had yet been given to C.S. PRMC was able to stabilize C.S., but he required transfer by helicopter to Children's Medical Center (CMC).

C.S. was in critical condition when he arrived at CMC in Dr. Matthew Cox's care. Dr. Cox also ran tests which confirmed PRMC's positive result for opiates. C.S. slipped into a coma and required aggressive resuscitation. Cox documented "[t]he pattern of bruising . . . was consistent with being abused." Finally, Barbour arrived at CMC around 5:30 the following morning and met with Dr. Cox. Barbour said C.S. was spinning around to make himself dizzy and fell on his buttocks and forehead simultaneously around 10:00 a.m. Barbour explained that he did not notify Hurst, who was at work until thirty minutes before the ambulance was called, because C.S. was active and playful

3

after the fall. Cox concluded Barbour provided "inadequate explanation for [C.S.'s] hospitalization." CMC continued to treat C.S.'s life-threatening condition and notified the police and the Department of Family and Protective Services of the possible abuse.

Fortunately, C.S. awoke from the coma and family was allowed to visit him. Intensive care unit nurse Debbie Kay Smith monitored his vital signs. Smith noticed a curious pattern in C.S. Whenever Barbour would enter the room, his "blood pressure . . . would go up by 20 points every time." She could tell C.S. was uncomfortable, especially when left alone with Barbour because "[h]is heart rate was going up; his blood pressure was going up," and he did not have this physiological reaction to anyone else. At one point, C.S. requested to speak to Hurst. "[A]s she walked in the room, he was going to start to try to talk to her. And then when [Barbour] got into his line of vision, . . . he had tears well up in his eyes. And he says, oh, never mind."

Detective Shane Boatwright responded to the report provided by Dr. Cox. Again, Hurst admitted to spanking C.S., but only three times. Next, Boatwright spoke to Barbour, who was described as "just kind of bubbly . . . it was just kind of rapid, rapid fire talking to me . . . he was eager to talk." He "didn't appear to be upset or . . . even really concerned." Barbour said "he had been spinning the kids around and, like in a circle, and that he and [C.S.] had both gotten dizzy, said that [C.S.] had fell down, said he sort of hit his butt and his head on the floor simultaneously." C.S. complained of a headache a few hours later. Barbour then claimed it was normal for C.S.'s lips to turn purple on occasion. He told the detective that he was a weak disciplinarian and that the bruising

4

on the scrotum might have occurred when he put C.S. in the shower. Boatwright concluded there were discrepancies in Barbour's story.

After the interview, C.S.'s grandfather asked Boatwright to come to C.S.'s room "because [C.S.] was trying to talk and that [Barbour] was trying to keep him from it." Boatwright cleared the room of family and interviewed C.S. in the presence of nurses and another detective. C.S. stated during the interview that Barbour had given him a yellow liquid that made him feel dizzy and that he did not remember anything after ingesting the liquid. C.S. stated Barbour hit him with a switch two nights before because he had wet the bed. He described how Barbour put him between a mattress and a box spring and laid on the bed, making it hard for C.S to breathe. Barbour would spank him with a belt and a wooden spoon. C.S. said Barbour told him to lie to the officers and say he had fallen off a bike if they asked him what happened. After hearing C.S.'s statement, Boatwright looked for Barbour to continue with questioning, but he had left the hospital. Hurst claimed Barbour left to get something to eat, but Barbour said he was visiting a friend.

The State prosecuted Barbour on two counts of injury to a child, that he intentionally or knowingly caused serious bodily injury to C.S. "by administering to him or exposing him to a substance that contained morphine or heroin," and "by hitting or striking him with a wooden paddle or spoon or with a belt."

At trial, the jury heard from C.S., who said Barbour was "[s]winging me around by my ankles and threw me into a coffee table" causing him to pass out. C.S. did not hurt from the accident, but

5

Barbour "gave me some yellow stuff . . . [i]n a spoon" that made him feel dizzy. C.S. went into further detail about his abuse and started by saying Barbour "treated [him] pretty good in the daytime but then at night he would" wake him up and "beat [him]" in the back yard or in the shop in the yard. The beatings occurred at least twenty times. Barbour would hit C.S. with extension cords, belts, tree branches, or a wooden spoon. C.S. would be beat in the legs, on his "private," and "bottom." C.S. told the jury he "was so scared of peeing the bed" because Barbour "would put clothes pins on my private" and would hit him in his "private parts." C.S. claimed he told his mother about the beatings once, but she did nothing. C.S. also said his mother would beat him with a belt when he got a spanking. He testified that the beatings by Barbour led to bruising.

At trial, Vrba testified that C.S.'s white blood count was elevated, indicating trauma or infection, and that the bruises to C.S. could be caused by something long and narrow like an extension cord. Dr. Clark believed that the bruising to the private area would be consistent with being beaten with a wooden spoon. He countered Barbour's explanation that C.S. had fallen on his head and buttocks simultaneously by pointing out the injuries to both sides of the head, which would not be consistent with one fall to the ground. Dr. Cox believed the bruising to the neck was caused by someone grabbing C.S. by the neck. The linear bruising was "consistent with being struck with an object . . . at least six discreet [sic] little areas . . . relative fresh bruises. . . . There were some bruises on his leg that . . . raised clear concerns that there were older bruises as well."

6

The defense theory at trial opined the possibility that Hurst had inflicted the bodily injury to C.S. Hurst was a nurse for an assisted living home. Because she oversaw the medication room, she had access to liquid morphine. At trial, Hurst denied taking any action which would cause bruising to C.S.'s private areas. She went to work at 5:45 a.m. on the day in question and returned home before 8:30 p.m. Hurst told the jury she called the ambulance, which arrived at 9:00, immediately after checking on C.S. She had left C.S. in Barbour's care for the day. Hurst denied giving C.S. Benadryl or morphine.

Toxicologist Chris Heartstill testified that morphine is metabolized by the body within ten to twenty hours. Based on his testing, which occurred at 11:00 a.m. the day after C.S. was brought to the hospital, Heartstill stated it was reasonable to conclude the morphine was given to C.S. around noon the day before. Again, C.S. was in Barbour's exclusive care when the morphine could have been administered. Dr. Cox explained that morphine will "kick in within half an hour to an hour, and it has relatively quick symptoms."

These symptoms were witnessed by Matthew Sugg, C.S.'s eight-year-old friend, who went to C.S.'s home around 4:00 or 5:00 p.m. on the day of the incident. Sugg testified Barbour opened the door, let him in, but told him C.S. was asleep. Sugg went to C.S.'s room anyway and saw that he was sleeping and "his eyes and lips were bluish." He witnessed Barbour "[s]quirting [C.S.] in his face with" a water bottle. C.S. did not wake up. This testimony was contrary to Barbour's story to Boatwright that C.S. was alert and playful after the alleged fall.

7

Chris Upchurch was in jail with Barbour. Upchurch testified Barbour

> told me that his girlfriend was a nurse and that she was stealing drugs from the nursing home or taking drugs from the nursing home from the elderly patients. And they were taking them and either selling them -- using some and selling some of the others. . . . Then he told me that the reason he was there is that he sold or gave some liquid morphine to a cousin of hers or relative of hers and they took -- they drank it and it caused them to go into a coma and had a real adverse effect upon them. . . . He said, stupid son-of-a-bitch drank the liquid morphine and had an adverse effect on him and went into a coma and almost died.

After hearing the evidence, the jury convicted Barbour on both counts of injury to a child.

## II. Legally and Factually Sufficient Evidence Supported the Jury's Verdict

### A. The Hypothetically Correct Jury Charge

Our analysis of whether the evidence is legally and factually sufficient is measured against the elements of injury to a child with the same kind of analysis as that applied in the test for a hypothetically correct jury charge for the case.[1] *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *see also Grotti v. State*, 273 S.W.3d 273, 280 (Tex. Crim. App. 2008). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240. It is used to evaluate both legal and factual sufficiency. *Grotti*, 273 S.W.3d at 281.

---

[1]*Malik* controls "even in the absence of alleged jury charge error." *Gollihar v. State*, 46 S.W.3d 243, 255 (Tex. Crim. App. 2001).

8

Barbour was indicted for intentionally or knowingly causing serious bodily injury to a child in violation of Section 22.04(a)(1) of the Texas Penal Code. TEX. PENAL CODE ANN. § 22.04(a)(1) (Vernon Supp. 2009). Under a hypothetically correct charge in this case, the jury was required to find, beyond a reasonable doubt, that: (1) Barbour; (2) intentionally or knowingly; (3) caused C.S., a child; (4) serious bodily injury. *Id.* The degree of harm to the child (serious bodily injury versus bodily injury), and the intent requirement (intentionally or knowingly versus recklessly or with criminal negligence), determine the grade of the offense. TEX. PENAL CODE ANN. § 22.04(e) (Vernon Supp. 2009). Serious bodily injury is "bodily injury that creates a substantial risk of death." TEX. PENAL CODE ANN. § 1.07(46) (Vernon Supp. 2009).

Also, injury to a child is a result oriented crime because the focus of the *mens rea* is on the result of the conduct, not the conduct itself. *Haggins v. State*, 785 S.W.2d 827, 828 (Tex. Crim. App. 1990); *Patterson v. State*, 46 S.W.3d 294, 301 (Tex. App.—Fort Worth 2001, pet. ref'd); *Banks v. State*, 819 S.W.2d 676, 678 (Tex. App.—San Antonio 1991, pet. ref'd). "What matters is that the conduct (whatever it may be) is done with the required culpability to effect the *result.*" *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1986); *see Dunn v. State*, 13 S.W.3d 95, 97–98 (Tex. App.—Texarkana 2000, no pet.). Thus, "it is not enough for the State to prove that [Barbour] *engaged in conduct* with the requisite criminal intent, the state must also prove that [Barbour] *caused the result*" intentionally or knowingly. *Delgado v. State*, 944 S.W.2d 497, 498 (Tex. App.—Houston [14th Dist.] 1997, writ ref'd); *Lee v. State*, 21 S.W.3d 532, 540 (Tex. App.—Tyler 2000, pet. ref'd)

9

(citing *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994)). It is this intent to cause the result that is the focus of Barbour's appeal.

For this offense, Barbour acted intentionally if it was his "conscious objective or desire to . . . cause the result." TEX. PENAL CODE ANN. § 6.03(a) (Vernon Supp. 2009). He acted knowingly if he was "aware that his conduct [was] reasonably certain to cause the result." TEX. PENAL CODE ANN. § 6.03(b) (Vernon Supp. 2009).

**B.      The Evidence Was Legally Sufficient to Support the Verdict**

The requirement of legal sufficiency confirms that a fact question was raised by the evidence. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). If the evidence in this case was insufficient to raise an issue of Barbour's guilt, there was no issue for the jury's resolution. *Id.* When conducting a legal sufficiency analysis, we review all of the evidence in the light most favorable to the verdict and determine whether any rational jury could find the essential elements of injury to a child as charged by the indictment beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Lacour v. State*, 8 S.W.3d 670, 671 (Tex. Crim. App. 2000) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)); *Clewis*, 922 S.W.2d at 132–33; *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

When reviewed in a light most favorable to a finding of guilt, C.S. testified Barbour gave him medicine which made him dizzy. Upchurch recounted Barbour's statements in jail that he gave someone morphine. Heartstill's toxicology report indicated morphine was given to C.S. around noon

10

on the day C.S. was taken to the hospital by ambulance. According to Hurst, Barbour was left to take care of C.S. on that day. C.S.'s friend Sugg testified that Barbour was the only adult in the home when he went to visit and that Barbour attempted to wake C.S. up by squirting him in the face with a water bottle around 4:00 or 5:00 p.m. A rational jury could have found Barbour administered the morphine to C.S.

Heartstill stated "any morphine given to an eight year old is going to be a dangerous dose and could be lethal." Dr. Clark also concluded opiates could cause serious bodily injury, and Dr. Cox stated morphine given to an eight year old could be considered a deadly weapon.[2] Vrba and Cody described C.S. as being on the verge of death when he arrived in the PRMC emergency room. Dr. Clark explained that the morphine ingestion explained C.S.'s critical condition caused by respiratory failure. A rational jury could have found Barbour's administration of morphine to C.S. caused him serious bodily injury which created a substantial risk of death.

Finally, a rational jury could have determined Barbour administered the morphine to C.S. with awareness that his conduct was reasonably certain to cause C.S. serious bodily injury. Barbour's brief states "[t]here was no direct evidence that Mr. Barbour knew that morphine would cause serious bodily injury." Even putting aside common sense and the general knowledge of the hazards of morphine, Barbour's requisite culpable mental state can be inferred from surrounding circumstances, his acts, words, and conduct, and from the extent of C.S.'s injuries. *Patrick v. State*,

---

[2]Barbour does not contest the deadly weapon finding.

11

906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984); *Dunn*, 13 S.W.3d at 98–99. Here, C.S. described a pattern of physical injury and abuse by Barbour. Sugg testified he saw Barbour spraying a nonresponsive, "bluish" C.S. in the face with a water bottle around four or five o'clock in the evening. Despite Barbour's knowledge that C.S. was nonresponsive, he did not notify Hurst or call an ambulance. Instead, he waited several hours for Hurst to return home, find her son, and call an ambulance. A jury may reasonably infer that the defendant intentionally, not accidentally, inflicted an injury when he or she fails to render aid known to be needed. *Tezino v. State*, 765 S.W.2d 482, 485 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd).

The jury was also entitled to consider other abusive conduct toward the child by the defendant. *Id.* C.S. testified that Barbour had beaten him more than twenty times and committed other acts of violence toward him. C.S. was bruised on his face, neck, legs, scrotum, penis, buttocks, hip, and shins. The evidence established Barbour was not at the residence when the ambulance arrived. He also never arrived at PRMC emergency room. It was not until 5:30 the following morning that Barbour apeared at CMC. While there, nurses noticed that C.S. was uncomfortable around Barbour, whose explanations to officers about C.S.'s condition were not found plausible. C.S. told officers that Barbour warned him to conceal what had happened by expressing that the injuries were caused by a fall from a bicycle. After Boatwright interviewed C.S., Barbour left the hospital. A reasonable inference also arises in the presence of proof that the defendant tried to

12

conceal the conditions that led to the victim's injuries. *Id*. We find that a rational jury could have determined Barbour knowingly gave C.S. the morphine when he was aware that his conduct was reasonably certain to cause the result of inflicting serious bodily injury on C.S.

Thus, we conclude the evidence was legally sufficient to find all elements of injury to a child as alleged in the indictment to support the jury's verdict.

### C. The Evidence Was Factually Sufficient to Support the Verdict

Unlike legal sufficiency review, we examine the evidence in a neutral light when assessing factual sufficiency and determine whether the proof of guilt is obviously weak as to undermine confidence in the verdict, or, if taken alone, is greatly outweighed by contrary proof so as to be clearly wrong and unjust. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997); *Harris v. State*, 133 S.W.3d 760, 764 (Tex. App.—Texarkana 2004, pet. ref'd). A clearly wrong and unjust verdict is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). Because factual sufficiency is an issue of fact, we are not free to reweigh the evidence and set aside the verdict merely because we feel a different result is more reasonable. *Clewis*, 922 S.W.2d at 135.

The majority of contrary proof involved the defensive theory that Hurst administered the morphine and beat C.S.—including her access to morphine at her job and her admission to spanking C.S. with a belt three times a few days before. Since we have determined the evidence raised issues

13

for the jury's resolution, we will not sit as the thirteenth juror re-evaluating the weight and credibility of the evidence. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Instead, we give full play to the jury's responsibility to weigh the evidence, resolve conflicts in the testimony, and draw reasonable inferences from basic facts. *Johnson*, 23 S.W.3d at 7; *Clewis*, 922 S.W.2d at 133; *Bottenfield v. State*, 77 S.W.3d 349, 354 (Tex. App.—Fort Worth 2002, pet. ref'd) (citing *Jackson*, 443 U.S. at 319).

In reviewing all of the evidence in a neutral light, including Hurst's denial that she gave C.S. morphine, and C.S.'s testimony, we cannot say the evidence of Barbour's guilt was greatly outweighed by testimony reflecting the defensive theory. We find nothing unjust or shocking about the verdict and conclude the evidence was factually sufficient to support it.

## III.  Conclusion

We affirm the trial court's judgment.


Jack Carter
Justice


Date Submitted:     January 4, 2010
Date Decided:        January 27, 2010

Do Not Publish

14